IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DANA MCNEAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:11-CV-02612-BH-L |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order* reassigning the case dated October 12, 2011, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed January 9, 2012 (doc. 42), and *Defendant's Motion for Summary Judgment*, filed February 3, 2012 (doc. 43).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**I.  BACKGROUND[1]**

**A.    Procedural History**

Dana Gay McNeal (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability benefits and supplemental security income under Titles II and XVI of the Social Security Act.  (R. at 16–31.)  On July 2, 2008,

---

[1]    The background information comes from the transcript of the administrative proceedings, which is designated as "R."

-1-

Plaintiff applied for disability benefits and supplemental security income, alleging disability beginning on December 15, 2003, due to bipolar disorder and obsessive compulsive disorder. (R. at 16, 154–59, 176.) Her applications were denied initially and upon reconsideration. (R. at 84, 99.) She timely requested a hearing before an Administrative Law Judge (ALJ). (R. at 105–06.) She personally appeared and testified at a hearing held on September 25, 2009. (R. at 38–77.) On May 13, 2010, the ALJ issued her decision finding Plaintiff not disabled. (R. at 16–31.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on July 29, 2011, making the ALJ's decision the final decision of the Commissioner. (R. at 4–6.) She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 42.)

B.   **Factual History**

1.   **Age, Education, and Work Experience**

Plaintiff was born on March 14, 1959; she was 50 years old at the time of the hearing. (R. at 42.) She completed the 8th grade and has past relevant work as a hair stylist. (R. at 42, 49, 70.)

2.   **Medical, Psychological, and Psychiatric Evidence[2]**

On April 8, 2003, Plaintiff presented to Baylor of Richardson Medical Center (Baylor) to "undergo [a] detox[ification] from opiates and benzodiazepines." (R. at 1630–1806, 1937–2003.) She told Pedro Perez, M.D., the attending physician, that "she got addicted to opiates because she had extreme discomfort and abdominal pain." (R. at 1993.) Dr. Perez noted that she "went through a usual detox protocol uneventfully" and "appear[ed] to be functioning reasonably well." (*Id.*) He diagnosed her with polysubstance dependence, dependent histrionic trait, and moderate chronic

---

[2]   Because this action is ultimately resolved based on Plaintiff's mental impairments, the only medical evidence included in this summary relates to her substance addiction disorder.

abdominal pain, and assigned her a Global Assessment of Functioning (GAF) score of 50.[3]  (*Id.*)

Although her condition had "improved," his prognosis was "guarded" due to her "low white [blood

cell] count and anemia."  (R. at 1994.)  Plaintiff complained of abdominal pain that was "constant"

and "unrelated to meals."  (R. at 2003.)  It was Dr. Perez's "impression that [she] was really hoping

to get some opioid medication again to control [her] pain."  (*Id.*)  He admitted her to the hospital for

seven days for further observation and placed her on a "clear liquid diet."  (R. at 2001.)  While at

the hospital, Plaintiff told a nurse that she had "been in two other detox places and this [was] the first

time [she felt] detoxed," and she did not "want to be on any addicting pills" anymore.  (R. at 1985.)

Plaintiff also underwent a psychiatric evaluation at Baylor.  (R. at 1776–86.)  She told the

psychiatrist that she had been taking 30 Vicodin pills and 30 milligrams of Klonopin a day for the

past six years.  (R. at 1776.)  She experienced "auditory hallucinations when using [drugs]

sometimes," and she complained of middle insomnia.  (R. at 1782.)  The psychiatrist noted that she

seemed disheveled, friendly, lethargic, and depressed, and had a flat affect.  (*Id.*)  She made good

eye contact; was oriented to person, time, place, situation, and date; spoke with a monotone voice;

her thought processes were coherent; and her judgment and insight were poor.  (*Id.*)  She had

recently lost her job, was unable to pay her bills, and spent all her money on medications.  (R. at

1783.)  She began abusing medication as a result of "ulcer problems"; she started taking four tablets

of Vicodin three times a day and eventually increased her dosage to ten tablets three times a day.

(*Id.*)  Plaintiff lived alone, and her son was her only family member who lived close by and

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 41 to 50 indicates serious symptoms, such as suicidal ideations and severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job.  *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

supported her.  (*Id.*)  Before discharging her on April 15, 2003, Dr. Perez found that "she was stable" and was "no longer having any detox symptoms."  (R. at 1993.)

On July 4, 2003, Plaintiff presented to Medical Center of Plano (MCP) complaining of nausea and cramps due to "opiate withdrawal." (R. at 1889, 1898.)  She admitted taking Vicodin, Demerol, morphine, and heroin regularly. (R. at 1898.)  She had last used drugs the day before.  (R. at 1889.)  She was subsequently transferred to Richardson Regional Medical Center (Richardson Regional) to undergo another detoxification procedure, and stayed there until July 11, 2003.  (R. at 1817–1885, 2082–2189.)  She told Robert Harden, M.D., the treating physician, that she had been abusing heroin, morphine, Demerol, and Klonopin for many years, but she now wanted "to get off drugs." (R. at 2165.)  Upon her discharge, she received information about Narcotics and Alcoholics Anonymous but"refused [a] therapist referral[]." (R. at 1839.)

Plaintiff was admitted to Presbyterian Hospital of Dallas (Presbyterian) on July 24, 2003, because she was having seizures. (R. at 2384.)  In a toxicology analysis, she tested positive for opiates, cocaine, cannabinoids, benzodiazepines, and barbiturates.  (R. at 2391.)

On August 10, 2003, Plaintiff was taken to Green Oaks Hospital and Behavioral Healthcare Services (Green Oaks) by a peace officer of the Dallas Police Department (DPD) because she was severely depressed and suicidal. (Tr. at 722.)  Her plan was to overdose on "anything and everything." (*Id.*)  She showed evidence of self-destructive behavior and reported feeling "overwhelmed, depressed, isolated, withdrawn, and suicidal." (*Id.*) She told Chris A. Carson, M.D., the examining psychiatrist, that she was "using multiple drugs, including … marijuana, but was primarily addicted to 'opiates,'" including "heroin, Demerol, morphine, Vicodin, Lortab, and cocaine." (*Id.*)  She last used cocaine on August 9, 2003, and used heroin two days earlier.  (*Id.*)

She had used Vicodin for the past 25 years.  (*Id.*)  Dr. Carson found she appeared unkempt, disheveled, agitated, and tense. (R. at 723.)  Her affect was anxious, sad, and guarded; her thought content was suspicious; and her judgment and insight were poor. (*Id.*)  Dr. Carson diagnosed her with personality disorder and depression, and assigned her a GAF score of 50. (R. at 724.) The next day, she left the hospital "against the advice of [her] physician."  (R. at 741.)

Plaintiff was again admitted to Richardson Regional due to "drug withdrawals" on June 15, 2004.  (R. at 1468–84.)  She tested positive for benzodiazepines, cannabinoids, and cocaine in a toxicology analysis.  (R. at 1479.)  On November 18, 2004, she had another toxicology analysis there and tested positive for benzodiazepines, cannabinoids, cocaine, and opiates.  (R. at 1546.)

Plaintiff saw Fazila Siddiol, M.D., a psychiatrist at Adapt of Texas Dual Disorders Center (Adapt), for an initial psychiatric evaluation on June 19, 2008.  (556–61.) During the evaluation, Plaintiff displayed wide mood swings and seemed depressed and "easily irritable." (R. at 556.)  She stated that her appetite had recently improved, but her sleep, energy, and memory had worsened. (*Id.*)  She told Dr. Siddiol that she began using "crack cocaine" five years earlier and had come to use it on a "daily basis."  (Tr. at 557.)  Dr. Siddiol found she was engaging and cooperative; had increased movements; was oriented to person, place, date, and situation; her appearance was fair, her speech was pressured; her mood was depressed; her affect was dysphoric; her thoughts were mildly circumstantial; her thought content was nihilistic; her recent and remote memories were fair; her intelligence was average; and her insight, judgment, and concentration were poor.  (R. at 558.) Dr. Siddiol diagnosed her with bipolar disorder, mixed; cocaine dependence; obsessive compulsive disorder (OCD); eating disorder, not otherwise specified (n.o.s.); and insomnia.  (R. at 559.)  He assigned her a GAF score of 45.  (*Id.*)

By July 30, 2008, Plaintiff was participating in Adapt's dual diagnosis/drug addiction rehabilitation program. (R. at 561.) She told her Adapt counselor that she was "still suffering from depression," and had mood swings and insomnia. (*Id.*) She admitted she was "having cravings for cocaine." (*Id.*) She shared that by age 26, she was "taking Vicodin" every day, getting it from the streets and from doctors, and used it regularly until eight months prior to joining Adapt. (*Id.*)

Plaintiff presented to LifeNet Community Behavioral Healthcare (LifeNet) for an initial consultation on September 18, 2008. (R. at 545.) Lauren Scurry, a qualified mental health professional (QMHP) and LifeNet counselor, interviewed her. (*Id.*) Ms. Scurry found that her mood was anxious and excited, her affect was angry, her speech and thought processes were logical, she had racing thoughts, appeared to have good hygiene, and was casually dressed. (*Id.*) They discussed "some issues that [Plaintiff] [was] anxious about, such as having food, money, using the bus, and attending all [her] required meetings and groups with LifeNet." (*Id.*) Plaintiff received weekly counseling sessions from Ms. Scurry from September 18, 2008 until November 6, 2008. (*See* R. at 520–45.) Their counseling sessions covered various topics, including preparing meals, using public transportation, recognizing and managing Plaintiff's depressive and manic symptoms, coping with her anxiety and insomnia, and developing healthy eating habits. (*See id.*) They also discussed her "concerns and stressors related to [her] treatment," such as making appointments, attending group discussions, "staying med[ication] compliant, and maintaining sobriety." (*See id.*)

On September 23, 2008, Rama P. Rao, M.D., a psychiatrist with LifeNet, interviewed Plaintiff and completed an initial psychiatric evaluation. (R. at 515–19.) On a 10-point scale, Plaintiff rated the severity of her symptoms at 5; her depression at 5; her manic symptoms, irritability, mood lability, appetite, level of interest, agitation, and energy level at 3; and her anxiety

and insomnia at 7. (R. at 515.) Dr. Rao rated her overall functioning at 3. (*Id.*) He diagnosed her with severe bipolar disorder and cocaine dependence. (*Id.*) She complained of insomnia and "always" being depressed and "worrying easily." (*Id.*) Her affect was irritable and worried, and she seemed anxious, bored, depressed, sad, and fearful. (*Id.*) Dr. Rao opined that she lacked a "primary support group," and had educational, occupational, social, housing, and economic problems. (*Id.*)

On September 29, 2008, J. Lawrence Muirhead, Ph.D., a psychological consultant for disability determination services, interviewed Plaintiff, conducted a psychological examination, and completed a mental status report. (R. at 483–86.) Dr. Muirhead found that she was "a competent historian whose report was partially compromised by episodic disturbances in concentration." (R. at 483.) He found that her "mixed substance abuse dat[ed] [back] to her adolescent years" and "primarily involve[d] cocaine and marijuana." (*Id.*) She had "a history of felony conviction for possession of a controlled substance resulting in two periods of incarceration." (*Id.*) After her release from her latest drug conviction in 2007, she was "arrested for prostitution" and was now "attempting to complete a five year term of probation" for that offense. (*Id.*) She had "a current sobriety date coincident with her last arrest for prostitution," and "estimated that her longest period of sobriety in the free world ha[d] been one year." (*Id.*)

Dr. Muirhead found that Plaintiff "ha[d] a history of episodic use of psychotropic[] [medications], that were prescribed [to her] for mood volatility, in conjunction with substance abuse." (*Id.*) She reported being "briefly psychiatrically hospitalized on three occasions." (*Id.*) "The only periods of time in which she [had] consistently made use of psychotropic[] [medications] was during a five month period of incarceration … approximately ten years [earlier], and a current use of [them] while residing in supported housing of LifeNet." (R. at 483–84.) Throughout the

interview, Plaintiff "complained of persisting daily anxiety and depression." (R. at 484.) "She experience[d] episodic weeping spells, ha[d] variable energy level, and her sleep [was] erratic." (*Id.*) "[T]he dominant features of her mental status were [her] high tension level and anxiety." (*Id.*)

Plaintiff "also reported symptoms of bulimia." (*Id.*) She had "no history of suicide attempt." (*Id.*) She told Dr. Muirhead that she "dropped out of school in the ninth grade … after becoming involved in substance abuse." (*Id.*) She began living on her own at the age of 17. (*Id.*) "In 1984, she obtained a license as a cosmetologist" and "worked as a hair stylist until 2003." (*Id.*) She left her last job "because [she] couldn't stand it anymore." (*Id.*) "She estimated that her longest period of sustained full-time employment was four years." (*Id.*) She had been married three times, had "been separated from her third husband for seven years", and "ha[d] one adult child, age thirty-two." (*Id.*) She currently resided in "transitional housing" provided by LifeNet. (*Id.*) Before that, she lived "in a group home at Adapt following her last incarceration." (*Id.*) For the past "several years, she ha[d] led a homeless existence and supported herself through involvement in prostitution." (*Id.*) "Her income [was] limited to food stamps [totaling] $176 per month." (*Id.*)

Plaintiff did not drive but was "competent to utilize public transportation." (*Id.*) "She [was] independent in her dress and hygiene and routinely perform[ed] household chores." (*Id.*) Dr. Muirhead opined that she was "competent to manage funds and ha[d] adequate literacy skills." (*Id.*) She told him that "she maintain[ed] no active friendships and her only significant social contact[s] [were] the other residents at the transitional housing program at LifeNet." (*Id.*) "She attend[ed] group counseling sessions" three times a week and occasionally watched television, but she had "no active hobbies or interests." (*Id.*)

In his mental status report, Dr. Muirhead noted that Plaintiff was casually dressed, "was mildly disheveled in appearance, and in need of dental care." (R. at 485.) She measured 65 inches and weighed 180 pounds. (*Id.*) She appeared "visibly tense, wringing her hands and shredding a Kleenex during the course of the interview." (*Id.*) "Her speech was well modulated and produced at a normal rate"; her attitude was "somewhat simplistic and cooperative"; her "mood reflected prominent elements of anxiety; and she became tearful when discussing her history of early school dropout." (*Id.*) She had a restricted affect and her "thought processes were occasionally interrupted by lapses in concentration, but she was able to remain topic-oriented." (*Id.*) She scored "below average" on a short-term memory test, and on a test of "delayed recall, she reported only two of three presented items after a five minute delay." (*Id.*)

Dr. Muirhead noted that Plaintiff's "thought processes reflected adequate conceptual development"; "she appeared to function in a low average range"; her "judgment appeared to be partially compromised by [her] high tension level and anxiety"; her "sensorioum was clear"; she "was able to correctly specify her date of birth, age, and the date of the evaluation"; she showed "no evidence of psychotic process or impairment of reality testing"; and she "understood the purpose of the evaluation." (*Id.*) When "describing her current outlook," she stated: "I'm scared that I can't keep up anymore with things." (*Id.*) Dr. Muirhead diagnosed her with mixed substance abuse in remission; bipolar disorder, n.o.s., in partial remission; personality disorder; and minor gastric ailment. (*Id.*) He assigned her a GAF score of 52, indicating "moderate" symptoms. (*Id.*) He identified her psychosocial stressors as her unemployment and homelessness. (*Id.*)

On October 7, 2008, Cate Miller, M.D., a non-examining state agency medical and psychological consultant (SAMC), reviewed Plaintiff's treatment records and completed a

psychiatric review technique form (PRTF) and a mental Residual Functional Capacity (RFC) assessment. (R. at 487–504.) Dr. Miller compared Plaintiff's mental disorders to listings 12.04 for affective disorders and 12.09 for substance addiction disorders. (R. at 487.) She diagnosed her with bipolar disorder, n.o.s., in partial remission, personality disorder, and mixed substance abuse in early remission. (R. at 490, 494–95.)

Dr. Miller opined that Plaintiff had mild restrictions in her activities of daily living and social functioning; a moderate restriction in maintaining concentration, persistence, and pace; and had experienced no episodes of decompensation of extended duration. (R. at 497.) She noted Plaintiff's history of incarceration, as well as her enrollment in a dual diagnosis/drug rehabilitation program after her "most recent release" from prison. (R. at 499.) She also noted her alleged obsessive compulsive disorder (OCD) and personality disorder. (*Id.*) She referenced Dr. Muirhead's September 2008 observations that Plaintiff showed variable energy, anxiety, and depression; was "visibly tense"; her attitude was simplistic and cooperative; her affect was restricted; and her thought processes were "occasionally interrupted by lapses in concentration but she [remained] topic-oriented." (*Id.*) She concluded that Plaintiff's allegations were "only partially supported by [the medical evidence of record]" and she "appear[ed] to be fairly well compensated when not abusing substances." (*Id.*)

In her mental RFC assessment, Dr. Miller opined that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. at 501.) She opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R.

at 501–02.)  She further opined that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a work setting.  (*Id.*)  She opined that Plaintiff had no significant limitations in 11 other mental work-related functions, including her ability to make simple work-related decisions and work in proximity with others without being distracted by them.  (*See id.*)  Dr. Miller concluded that Plaintiff had the mental RFC to "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in [a] routine work setting."  (R. at 503.)  She found that her "allegations [were] somewhat supported" by the record, except for the alleged severity of her symptoms.  (*Id.*)

On October 16, 2008, Plaintiff presented to Ms. Scurry's office to discuss her "relapsing by taking one hit of cocaine."  (R. at 534.)  She told Ms. Scurry that "she felt very guilty and horrible while doing it and did not enjoy it like she used to," and assured her "that she was extremely motivated in her recovery and want[ed] to be independent from drugs and alcohol."  (*Id.*)  Ms. Scurry "educated [her] on practicing refusal ... [and] prevention skills."  (*Id.*)

Dr. Rao conducted another psychiatric evaluation and completed a mental status report on November 13, 2008.  (R. at 548.)  Plaintiff told him that her symptoms began when she was in junior high school; she experienced constant mood swings and was unable to concentrate in school.  (*Id.*)  He noted her psychiatric hospitalization at age 26 for depression and anxiety.  (*Id.*)  He observed that she appeared "older than her age" and "somewhat disheveled."  (*Id.*)  Her mood frequently shifted

from major depression to hyper-mania, and she showed severe anxiety and obsessive-compulsive behavior. (Tr. at 549.) Her medications included Tegretol, Wellbutrin, Diphenhydramine, Ambien, Abilify, and Klonopin. (*Id*.) He noted her long history of polysubstance abuse. (*Id*.) During the evaluation, Plaintiff needed "to be redirected multiple times to [the] conversation." (R. at 550.)

Plaintiff was aware of her mental illness and understood that she needed medications, but Dr. Rao opined that she lacked the insight to deal with her life problems independently. (*Id*.) He diagnosed her with bipolar disorder, most recent episode manic, severe without psychosis; generalized anxiety disorder with panic attacks; and cocaine dependence in remission for 10 months. (*Id*.) He opined that she could only work in a "low-stress environment" because stress exacerbated her wide mood swings. (*Id.*) His prognosis was "guarded" because she currently remained "manic" or "hypomanic" "in spite of aggressive medications." (*Id.*)

On November 25, 2008, Plaintiff had an in-office counseling session with Ms. Scurry. (R. at 1040.) Plaintiff "identified 2 symptoms [she] [was] currently experiencing:" "feeling down all day" and having "no interest in [her] favorite activities." (*Id.*) Ms. Scurry educated her about the symptoms of bipolar disorder by using symptom-tracking guides called "bipolar and depression brain sheets." (*Id.*) She also "educated [her] on coping skills, to help her cope with her symptoms," and on "setting daily goals [to] motivate her daily engage[ment] in activities as well as [to] be productive." (*Id.*) Plaintiff had seven counseling sessions with Ms. Scurry in December 2008. (*See* R. at 1039–34.) On December 22, 2008, she "reported feeling a little down and very anxious." (R. at 1034.) She also "reported … having increased goal directed behavior, such as cleaning the house every day, sometimes [even] twice." (*Id.*) Ms. Scurry "taught [her] some relaxation techniques such as deep breathing, imagery, and muscle relaxation to help her ease her anxiety and stress." (*Id.*)

Ms. Scurry visited with Plaintiff four times in January 2009. (R. at 1030–34.) On January 26, 2009, she "educated [her] on ... the symptoms relating to depression and asked [her] to express which symptoms she [was] currently … experiencing." (R. at 1030.) Plaintiff "stated that she [was] now on a regular sleeping pattern and waking up earlier," but "she [was] bored, [felt] depressed, and [did] not know what to do." (*Id.*) Ms. Scurry "educated [her] about creating a morning routine, … engaging in enjoyable activit[ies] such as reading, …[and] implementing [that morning] routine [to] decrease her symptoms of fatigue, boredom, and depression upon waking up." (*Id.*)

On February 11, 2009, Plaintiff presented to Presbyterian complaining of severe dental pain. (R. at 2217–24.) Russell Deguia Cruz, PA-C, the examining physician, noted she had a history of bulimia "that ha[d] caused [her] tooth decay." (R. at 2223.) Plaintiff underwent a toxicology analysis, and her results were negative for all the substances tested, including opiates, cannabinoids, benzodiazepines, amphetamines, and cocaine. (R. at 2219–20.)

Plaintiff presented to Green Oaks on February 12, 2009, and reported having "vague thoughts of suicide for the past 3 or 4 days." (R. at 744–45, 1133–52.) She told Dr. Butler that she heard whispering voices that "mock[ed] her," but she denied having any visual hallucinations. (R. at 745.) She also told him about her bulimia and stated that she vomited up to 10 times a day. (R. at 748.) Dr. Butler found that her thought processes were concrete but the content was "paranoia." (R. at 749.) She told him she was being treated at LifeNet, but she did not believe it was helping her. (R. at 752.) She was "very depressed and anxious, and ha[d] increased [suicidal ideations]." (*Id.*) She woke up "sickening manic," and by the evening, she "crashed [in]to a depression." (*Id.*) The next day, she was "still not feeling right," was "still depressed and labile," and complained of "ha[ving] very poor sleep" and "a lot of anxiety." (*Id.*)

Plaintiff was transferred from Green Oaks to Medical Center of McKinney (MCM) on February 13, 2009. (R. at 570.) She told Shamji P. Badhiwala, M.D., the examining physician, that she noticed an "increase in her symptoms of bulimia [and] depression" and was "having thoughts of suicide." (*Id.*) Although she had no "particular plans for suicide," she "was feeling extremely helpless and hopeless" and had "paranoid thoughts of people talking about her behind her back." (*Id.*) She also reported auditory and visual hallucinations. (*Id.*) She told Dr. Badhiwala that she was receiving psychiatric treatment at LifeNet, but she felt "like her medications were not working." (*Id.*) She was "getting more depressed and anxious," and was experiencing more panic attacks and suicidal ideations. (*Id.*) Dr. Badhiwala admitted her to the "behavioral unit" at MCM and placed her "on suicide precautions." (*Id.*) He assigned her a GAF score of 20,[4] prescribed her Wellbutrin, BuSpar, Klonopin, Cymbalta, Ambien, and Geodon, and discharged her three days later. (*Id.*)

On February 18, 2009, Ms. Scurry drove Plaintiff to Green Oaks because she was again feeling "suicidal." (R. at 764–65, 1153–1170.) Ms. Scurry told hospital staff that Plaintiff "called [her] hysterical" that day, "was voicing [suicidal ideations]," and was having "a lot of anxiety." (R. at 770.) Plaintiff told Dr. Butler that her bulimia was "controlling [her] life," making her vomit between 10 to 16 times a day, and was now starting to affect her gums and "cause her physical pain." (R. at 772.) She requested "hydrocodone" to relieve her abscess tooth pain. (*Id.*) Dr. Butler found that her speech rate and volume were normal; she was oriented; her affect was constricted; her immediate, recent, and remote memories were "intact"; and her train of thought was well organized. (R. at 773.) The next morning, Plaintiff "request[ed] her ordered pain med[ication]"

---

[4]  A GAF score of 11–20 indicates that the patient's behavior "is considerably influenced by delusions or hallucinations" or "a serious impairment, in communication or judgment," or an "inability to function in almost all areas." *See Diagnostic & Statistical Manual of Mental Disorders*, at 34.

upon waking, and the attending nurse "g[a]ve [her] Norco as ordered" for pain. (*Id.*) That day, Frank C. Webster, M.D., another Green Oaks psychiatrist, evaluated Plaintiff, reviewed her treatment chart, and diagnosed her with bipolar disorder, cocaine dependence, and OCD. (R. at 775.) He determined that her bulimia would "preclude[] the use of Wellbutrin," one of her anti-depressants. (*Id.*) He noted that a "tox[icology] screen" taken that day was "negative." (*Id.*) He acknowledged Plaintiff's request "for inpatient eating disorders treatment" and referred her to Northstar outpatient treatment center. (R. at 775–76.)

Plaintiff underwent a drug analysis administered by Quest Diagnostics at the direction of Dr. Rao from "LifeNet Community Healthcare" on February 20, 2009. (R. at 1442.) Her results were negative for most of the substances tested, including amphetamines, cocaine, marijuana, morphine, and alcohol, but she tested positive for opiates and hydrocodone. (*Id.*)

On February 23, 2009, Ms. Scurry took Plaintiff back to Green Oaks. (R. at 783–89, 1171–87.) She explained to the examining psychiatrist that Plaintiff had persistent suicidal ideations, a "history" of risky behavior, rapid mood shifts, and feelings of hopelessness, severe anxiety, panic, and agitation. (R. at 784.) Plaintiff reported seeing her "children and grandchildren" even though they "were not there." (*Id.*) She was sad because her son was in prison. (*Id.*) She also had "obsessive, intrusive thoughts about cleaning [her] house and … vomiting." (R. at 789.) That morning, she got out of bed at 1:45 a.m. to clean her house and cleaned it at least five times. (*Id.*) The next day, Raza Sayed, M.D., a Green Oaks psychiatrist, met with Plaintiff, reviewed her chart, and diagnosed her with "primarily personality" disorder and "likely anxiety" disorder. (R. at 792.)

-15-

He assigned her a GAF score of 35.[5]  (*Id.*)  Dr. Sayed noted that she was "focused on receiving narcotic med[ications] for [her] abscess tooth."  (*Id.*)  He also noted she "[was] on a cocktail of med[ications]" but opined that she "[was] only likely going to respond partially to [her medication] management due to [her] underlying personality [disorder]," and he referred her "back to LifeNet" for "med[ication] management."  (R. at 792–93.)  Before discharging her, he diagnosed her with bipolar disorder, most recent episode depressive, severe, with psychotic features; OCD; eating disorder, n.o.s.; anxiety disorder; personality disorder; hypertension and chronic pain.  He assigned her a GAF score of 40.  (R. at 793.)

An officer from the Dallas Police Department (DPD) escorted Plaintiff back to Green Oaks because she was hearing voices in her head on February 28, 2009.  (R. at 799–800, 1188–1206.)  Dr. Butler noted that she was "tearful and rocking back and forth" during the intake.  (*Id.*)  She told him that she continued throwing up and had recently lost 10 pounds.  (R. at 803.)  Dr. Butler found that her behavior was tense and manic, her mood was worried, and her affect was restricted.  (R. at 804.)  She appeared to have severe anxiety, panic, and agitation.  (*Id.*)  She told Dr. Butler that she "needed help" because her "episodes" were "getting worse."  (R. at 807.)  He noted that she was "actively seeking" "narcotic" prescriptions.  (R. at 812.)  He opined that her condition was "likely to improve" as long as she was "compliant" with her treatment.  (*Id.*)

On March 6, 2009, Plaintiff presented to Methodist Richardson Medical Center (MRMC) complaining of "increased depression, bad memories, hearing voices, and [having] suicidal ideation[s]" for the past two days.  (R. at 2008.)  She also complained of "severe pain" in her "upper

---

[5]  A GAF score of 31–40 indicates "[s]ome impairment in reality testing or communication" or a "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *See Diagnostic & Statistical Manual of Mental Disorders*, at 34.

tooth area where [a] filling broke off several weeks" earlier.  (*Id.*)  Roderick McCarthy, M.D., the examining physician, prescribed her "1 tablet" of "Norco" for her pain.  (*Id.*)  Her results in a toxicology screen that day were negative with respect to all the substances tested, including alcohol, cocaine, and opiates. (R. at 2011.)  She was transferred to Richardson Regional after it was determined that she was stable.  (R. at 2014.)  The next day, she was transferred from Richardson Regional back to Green Oaks.  (R. at 2021.)

Upon arrival at Green Oaks, Plaintiff told Dr. Sayed that she had no energy, and her depression was so severe that she did not want to live any more. (R. at 818–19.)  She complained of taking too many medications and being confused about what to take and how much; she believed that her medications were not working or were prescribed at the wrong dosage.  (R. at 826.)  She was "sleeping OK," her anxiety was "under control," and she did not any have suicidal ideations, but she felt "like [she] could get that way if [she] [did  not] get help."  (R. at 827.)  Dr. Sayed noted that she was "mildly manic but stable and [was] not aggressive," was "cooperative and med[ically] compliant," showed no visible distress, and her vital signs were "within normal range."  (R. at 829.) Upon discharge the following day, Dr. Sayed's prognosis was "good" and Plaintiff was "feeling better," was "smiling," and was "ready to leave the hospital."  (R. at 830–31.)

Plaintiff returned to Green Oaks two days later because she was "feeling extremely depressed ... without a reason," and again complained that her medications were "not being effective."  (R. at 838, 1207–26.)  Her auditory hallucinations were "getting worse and [were] causing [her] all kinds of anxiety."  (R. at 842.)  She was at the point "where [she was] almost scared to get up" in the morning.  (*Id.*)  She told Dr. Sayed that she was "starting to get psychotic" and was not herself anymore.  (R. at 844.)  Her auditory hallucinations had been on-going for two months.  (*Id.*)  She

lacked the "energy" or "drive" to do anything, had recurrent panic attacks, and did not want to be around people because they knew "there [was] something wrong with [her]."  (*Id.*)  She "denied any alcohol [or] drug use."  (*Id.*)  Her boyfriend explained that "she [got] off balance and [did not] feel right" after she started a new medication.  (R. at 847.)

On March 9, 2009, Dr. Rao evaluated Plaintiff and completed a mental RFC questionnaire. (R. at 576.)  It stated that he met with her once a month, had diagnosed her with bipolar disorder, cocaine dependence, and generalized anxiety disorder and assigned a GAF score of 38. (*Id.*)  The "clinical findings" indicating the severity of her mental impairments were her "anxiety, mood swings/depression, and difficulty concentrating."  (*Id.*)  Her symptoms included appetite disturbance, thoughts of suicide, generalized persistent anxiety, substance dependence, flight of ideas, manic syndrome, and sleep disturbance.  (R. at 577.)

Dr. Rao opined that Plaintiff had "no useful ability to function" in three mental work-related abilities: respond appropriately to changes in a routine work setting; cope with normal work stress; and deal with stress of semi-skilled and skilled work.  (R. at 578–79.)  He opined that she was "unable to meet competitive standards" in three mental abilities: complete a normal workday and workweek without interruptions from psychologically-based symptoms; get along with co-workers without unduly distracting them or exhibiting behavioral extremes; and set realistic goals independently of others.  (*Id.*)  He found that she was "seriously limited" in nine mental abilities, including her ability to understand, remember, and carry out detailed instructions, maintain concentration for two hours, make simple decisions, accept instructions and respond appropriately to criticism, and interact appropriately with the general public.  (*Id.*)  She was limited in, but could "satisfactorily" perform, ten mental abilities, including her ability to understand, remember, and

carry out very short and simple instructions and sustain an ordinary routine without special supervision.  (*Id.*)  Dr. Rao opined that Plaintiff's mental impairments or treatment would cause her more than four absences from work a month and that her impairments had lasted or could be expected to last at least twelve months.  (R. at 580.)  Lastly, Dr. Rao opined that Plaintiff had difficulty working on a sustained basis due to her anxiety, poor personal relations, lack of insight, and mood swings.  (*Id.*)

Plaintiff returned to Green Oaks on March 11, 2009.  (Tr. at 837, 1226–44.)  She was noted for having several recent hospital visits.  (R. at 838.)  She told Dr. Sayed that she heard voices talking to her at the same time.  (*Id.*)  She stated feeling worse than ever, and felt like she might hurt herself.  (R. at 839.)  Although she seemed calm, she felt anxious and depressed.  (R. at 841.)  She also told Dr. Sayed that the voices in her head were so unbearable, that she was "afraid to get up" in the morning.  (R. at 842.)  Dr. Sayed explained that she needed to give her medications "enough time to be effective."  (R. at 850.)  She saw "the hospital as a 'magic cure' for her depression," but he stated that "it [was] just not going to work that way."  (*Id.*)

Four days later, Plaintiff complained that her symptoms were "worse" than ever and she was again feeling "suicidal."  (R. at 858.)  Green Oaks medical staff found her to be at a "nutritional risk" due to her eating disorder.  (R. at 859.)  She also reported flashbacks and panic attacks.  (R. at 867.)  When she was discharged, she had a GAF score of 65.  (R. at 871.)  She returned to Green Oaks several more times throughout March 2009, complaining of severe depression and suicidal ideations.  (*See, e.g.*, R. at 898, 916, 942, 952, 1199–1305, 1247–1305.)

On March 30, 2009, Ms. Scurry evaluated Plaintiff and completed a psychological assessment.  (R. at 1044–47.)  Ms. Scurry noted that Plaintiff "ha[d] very little support" from her

family "due to [their] lack of understanding of [her] mental illness" and their unwillingness to help her.  (R. at 1044.)  She noted Plaintiff had been "admitted to Green Oaks … 7 times since mid-February." (*Id.*)  She found Plaintiff often "experience[d] mood swings, racing thoughts, impulsive behaviors, difficulty focusing on task[s], delusional thinking, and alternat[ed] [between] depressed [and] manic symptoms that [affected] her [ability] to function." (*Id.*)  She opined that Plaintiff had "little ability to manage her emotions and symptoms, which [affected her ability] to engage in everyday tasks." (*Id.*)  Ms. Scurry noted Plaintiff "had extensive substance abuse treatment in [the] past" and had recently "graduated from a 90-day dual diagnosis treatment program."  (R. at 1045.)  That day, Plaintiff's stated goal was "to live a life independent from drugs [and] alcohol, and to learn symptom-management skills to help her better cope with her mental illness and function in society." (R. at 1046.)

Ms. Scurry visited Plaintiff at least nine times between February 3, and March 30, 2009. (*See* R. at 1021–29.)  On March 30, 2009, Plaintiff "reported no major symptoms" and "stated that she was doing very well on her new medication."  (R. at 1021.)  She had recently "started her outpatient therapy at Green Oaks and was very excited about getting help in that way." (*Id.*)  Ms. Scurry observed that she "appeared to be displaying manic symptoms," such as "being very talkative" and having "hyper-motor activity and racing thoughts." (*Id.*)  She "educated [her] … on the symptoms of mania and depression" and instructed her to "record her symptoms on a daily basis." (*Id.*)

Between April 1 and April 15, 2009, Plaintiff presented to Green Oaks on numerous occasions, complaining that "her medications [were] not working and she [was] having hallucinations."  (R. at 1307–1357.)  On April 1, 2009, she was "not doing well at all" and

complained of being "more labile" and having decreased sleep. (R. at 1312.) By April 5, 2009, "she [still] needed to get her medications straight." (R. at 1336.) Dr. Sayed noted "that [was] what she ha[d] said the last couple of visits [there]." (*Id.*) He decided "not [to] provide [her] any narcotics ... from [that] unit going forward." (*Id.*) She denied having any auditory or visual hallucinations, and was "agreeable with her discharge and safety plans." (*Id.*) Later that day, however, she presented to Baylor and requested narcotic pain medications. (R. at 583–89.) After the medical "[p]rovider refused to meet [her] request," she "refused to sign [her] discharge instructions and left ... without taking [her] instructions and prescriptions." (R. at 584.)

On April 8, 2009, Plaintiff underwent another drug test at Quest Diagnostics upon Dr. Rao's direction. (R. at 1441.) Her results were negative for all the substances tested, including amphetamines, benzodiazepines, cocaine, marijuana, opiates, and alcohol. (*Id.*)

Plaintiff told Ms. Scurry that she was "feeling okay" and had "no symptoms" on April 9, 2009, but Ms. Scurry noted that she "displayed symptoms of mania, such as flight of ideas, racing thoughts, [and] pressured speech." (R. at 1018.) Ms. Scurry taught her how to recognize her symptoms and record them in a monitoring log. (*Id.*) She opined that Plaintiff's "progress" was "evidenced by [her] implementing coping skills and not calling Green Oaks [regarding] a panic attack" she suffered the night before. (*Id.*)

By April 12, 2009, Plaintiff "continue[d] to focus on [her] dental pain and request[ed] hydrocodone" at Green Oaks. (R. at 1351.) After Dr. Sayed denied her request, she asked him to increase her dosage of Klonopin because her current dosage was "not working." (*Id.*) Dr. Sayed also denied that request and instructed her to see her "out-patient doctor." (*Id.*)

On April 16, 2009, Ms. Scurry met with Plaintiff for a counseling session. (R. at 1017.) They discussed Plaintiff's "current symptoms and stressors." (*Id.*) Plaintiff "denied [having] any symptoms at [that] time," and "reported feeling much better now that she [was] stable on her medications and complying with her treatment." (*Id.*) Ms. Scurry "educated [her] on medication training skills" and taught her how to order her prescriptions and pick them up from the pharmacy using public transportation. (*Id.*) She also "taught [her] [how to] read the label on the bottle and to fill her pill box appropriately." (*Id.*)

Between April 22, 2009 and May 4, 2009, Plaintiff had nine counseling sessions with Ms. Scurry and attended several group therapy sessions. (R. at 1379–88.) On April 22, 2009, Ms. Scurry noted that Plaintiff "appeared anxious, suspicious, [with] slow motion, and indecisive." (R. at 1386.) By April 29, 2009, Plaintiff felt "very panicky [but] [did] not know why." (R. at 1382.) Ms. Scurry "educated [her] that Green Oaks ER [was] for people who [were] in danger of harming themselves and others." (*Id.*) She advised her "to use her coping skills taught to her in group and meetings with her therapist/case manager" instead of presenting to Green Oaks, unless "she [felt] that she may hurt herself or someone else." (*Id.*) On May 4, 2009, Ms. Scurry advised her to "write down the questions and concerns she had for her new counselor," Jennifer Carranza, with whom she would be treating beginning the following week. (R. at 1379.)

Plaintiff underwent another drug analysis at Quest Diagnostics on May 1, 2009. (R. at 1440.) Her results were positive for cocaine but negative for all other substances. (*Id.*)

Plaintiff presented to Green Oaks on May 6, 2009, but was later transferred to Terrell State Hospital (Terrell) because she was found to be a "danger to [her]self." (R. at 1063.) Phillip B. Balleza, M.D., the admitting physician at Terrell, diagnosed her with bipolar disorder I, mixed with

psychotic features, poly-substance abuse, hypertension, and tooth abscess. (*Id.*) She told Dr. Balleza that her counselor from LifeNet took her to Green Oaks because she was having hallucinations and suicidal ideations. (R. at 1064.) She was "depressed almost on a daily basis and [was] very suicidal due to multiple psychosocial stressors." (R. at 1068.) She needed her medications "to be adjusted" because "her hallucinations ha[d] increased and were worse" after doctors increased her dosage of Wellbutrin. (*Id.*) Dr. Balleza noted that "[d]uring the interview, [Plaintiff] focuse[d] on her [tooth] abscess and request[ed] medication for it." (*Id.*) A review of her medical records revealed "a long history of prescription drug abuse including benzodiazepine and opioids." (*Id.*) She complained about her doctors discontinuing her Klonopin, "which she ha[d] been [taking] since she was 15 years old." (*Id.*) Her dental pain was "so severe that she need[ed] something much stronger" than the Motrin he prescribed her. (R. at 1069.) Dr. Balleza opined that she had a "moderate risk" of suicide or harming herself due to her psychiatric and physical illnesses, poor coping skills, family history, and severe psychosocial stressors. (R. at 1070.) He assigned her a GAF score of 30. (R. at 1073.)

John J. Makowski, M.D., another Terrell physician, examined Plaintiff on May 12, 2009, and found that she "was bright in her affect" and "engaging." (R. at 1065.) She "denied [any] hallucinations [and] … suicidal ideations after taking Geodon," and "state[d] that she had never been suicidal," but "admit[ted] that she was telling people that she was suicidal." (*Id.*) She also "readily admitted to abusing cocaine and opioids in the past." (*Id.*) She told Dr. Makowski "that the Effexor was doing well and [she] felt that it was helping her depression." (*Id.*) When she was "not on medication … she was manic," was "wild, … cleaned everything, [and] was unable to sleep." (*Id.*) Dr. Makowski diagnosed her with polysubstance dependence and instructed her to follow-up with

her family physician regarding her high blood pressure, acid reflux, and anemia, and he referred her to a dentist for her tooth abscess.  (R. at 1065–66.)  He encouraged her to attend Alcoholics Anonymous or Narcotics Anonymous "and get [a] sponsor."  (*Id.*)

Martin Robbie, M.D., also a Terrell physician, completed a "social assessment" on May 12, 2009.  (R. at 1095–1105.)  Plaintiff voiced concern about being taken off Klonopin.  (*Id.*)  Dr. Robbie noted her "history of drug seeking-type behavior."  (*Id.*)  He noted Ms. Carranza's report that Plaintiff had "recently tested positive for cocaine at her … appointment" with her parole officer.  (R. at 1096.)  Upon her discharge two days later, Plaintiff "denie[d] any suicidal/homicidal thoughts," and Dr. Robbie opined that she "had no issues with aggression or self-harm" and was "appropriate in both thought and mood."  (R. at 1102.)  He referred her to Parkland Hospital for her physical ailments and gave her information about drug rehabilitation centers where she could receive "intensive outpatient substance abuse treatment."  (*Id.*)

Plaintiff underwent another drug analysis at Quest Diagnostics at the direction of Dr. Rao on June 9, 2009.  (R. at 1439.)  Her results were negative for all the substances tested, including amphetamines, benzodiazepines, cocaine, marijuana, opiates, and alcohol.  (*Id.*)

On June 19, 2009, Ms. Scurry and other LifeNet counselors hosted a picnic to promote patients' social interaction and teach them how to "connect with [their] peers without abusing drugs or alcohol."  (R. at 1368.)  Ms. Scurry "taught [Plaintiff] that sharing a meal and engaging in recreational activities [were] effective and positive ways to interact with other individuals."  (*Id.*)  The following week, Ms. Carranza visited with Plaintiff and noted that her "hygiene [was] good and she [was] in good spirits."  (R. at 1367.)  Plaintiff "[was] doing well with [her] medications, [was] able to keep track of her medicines at a week's time, [and] [was] medication-compliant."  (*Id.*)  She

-24-

stated "being aware of her changing moods more often" and Ms. Carranza advised her to keep "a journal of events [that] may surround her changing moods." (*Id.*)

By June 26, 2009, Plaintiff "was not feeling like herself," "she felt agitated and angry and ... yelled at her boyfriend, which [was] not like her." (R. at 1364.) Ms. Carranza noted that she "seemed overly anxious and tense" and "could not state why she felt [that] way." (*Id.*) Ms. Carranza accompanied her to Green Oaks. (*Id.*) Ms. Carranza and Ms. Scurry visited with Plaintiff at her LifeNet home numerous times until July 16, 2009, her last counseling session on file. (*See* R. at 1358–86, 1363–71.)

Plaintiff underwent another drug analysis at Quest Diagnostics upon Dr. Rao's direction on August 11, 2009. (R. at 1438.) Her results were negative for all the substances tested, including amphetamines, benzodiazepines, cocaine, marijuana, opiates, and alcohol. (*Id.*)

On September 6, 2009, Plaintiff was again admitted to Green Oaks. (R. at 1398–1433.) Dr. Butler diagnosed her with bipolar disorder, OCD, borderline personality disorder, hypertension, esophageal reflux, history of schizophrenia, suicidal ideation, and tobacco use disorder. (Tr. at 1408.) Gary L. McDaniel, M.D., another Green Oaks psychiatrist, conducted a medical "reassessment" on September 8, 2009, and noted that Plaintiff was "assaultive to [the hospital] staff" and to "others." (R. at 1418.) Her boyfriend explained that "she was feeling kinda weird," "she wasn't feeling herself," and "she sometimes ha[d] different moods." (*Id.*) Dr. McDaniel opined that she was at "suicide risk" due to her "significant job loss" and severe "financial difficulty." (*Id.*) He discharged her with an updated medication list consisting of Wellbutrin, Klonopin, Neurontin, Lisinopril, Nexium, Tegretol, Geodon, and Ambien, and instructed her to follow-up with her primary care physician "for any medical problems." (R. at 1428.)

Plaintiff returned to Presbyterian complaining of severe dental pain on September 14, 2009. (R. at 2191–2202.)  She told the examining physician that Advil gave her "minimal [pain] relief." (R. at 2199.)  She underwent a toxicology test that day, and her results were negative for all the substances tested, including cannabinoids, cocaine, and opiates.  (R. at 2195.)

Ms. Carranza wrote an undated letter explaining that Plaintiff was referred to LifeNet's Assertive Community Treatment (ACT) Team program "due to her inability to handle her activities of daily living without intensive assistance." (R. at 1434.)  She explained that Plaintiff had "been assigned to [her] case load for the past three months." (*Id.*)  Plaintiff "had the most difficulty with her medications and being able to responsibly keep track of her daily doses." (*Id.*)  She personally delivered Plaintiff's medications "three times a week, leaving her only responsible for two days of medications at a time." (*Id.*)  She opined that Plaintiff was "progressing through the ACT program and [was] becoming able to function on more of an adult level." (*Id.*)  Plaintiff had "willingly gone through a dual diagnosis drug rehabilitation program while assigned to the ACT Team and ha[d] abstained from using any illegal drugs; which ha[d] greatly enhanced her stability and cognitive abilities." (*Id.*)  Despite her progress, Ms. Carranza opined that Plaintiff should "continue with the ACT Team program for the foreseeable future due to her low functioning ability without the intensive structure inherent to" the program.  (*Id.*)

Dr. Rao also submitted an undated letter.  (*See* R. at 1435.)  He stated that Plaintiff was "currently an ACT Client of LifeNet" and "reside[d] in LifeNet Housing." (*Id.*)  He explained that she "had a chemical dependency problem for years; which ha[d] exacerbated her mental health issues." (*Id.*)  She "dealt with her bipolar condition for many years without being diagnosed or treated and self-medicating with illegal substances" and her "level of functioning was extremely low

-26-

due to her drug abuse." (*Id.*)  She was currently "working with LifeNet to gain an understanding of her drug abuse cycle and learn[] how to cope with daily life issues without abusing illegal substances." (*Id.*)  She had "willingly gone through a dual diagnosis drug rehabilitation program while assigned to the ACT Team and ha[d] abstained from using any illegal drugs; which ha[d] enhanced her stability and assisted her in gaining an understanding of her mental illness." (*Id.*)  He opined that despite her abstinence from "illegal drugs [and] alcohol," she still "require[d] the structure and assistance … provided through LifeNet's [ACT] Team in order to maintain her level of current stability and cognitive functioning." (*Id.*)

On September 24, 2009, Plaintiff underwent her last drug analysis at Quest Diagnostics on file. (R. at 1437.)  Her results were negative for all the substances tested including amphetamines, benzodiazepines, cocaine, marijuana, opiates, and alcohol. (*Id.*)

### 3. Hearing Testimony

On September 25, 2009, Plaintiff, her counselor, and a vocational expert testified at the hearing before the ALJ. (R. at 37–77.)  Plaintiff was represented by an attorney. (R. at 39.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she had been living in "LifeNet Housing" for a year. (R. at 43.)  Before that, she "was in a program for 90 days for Adapt for mental illness." (*Id.*)  She was incarcerated in 2007 or 2008 before joining Adapt. (*Id.*)  She was convicted of felony prostitution and was released on probation, but she went to jail for violating her probation. (*Id.*)  Although she did not remember the exact dates, she remembered being detained in a state "substance abuse punishment facility" in Burnet, Texas, between 2003 and 2006. (R. at 43–44.)  "[T]hey [were] supposed to help [her] with [her] mental illness … but they never did." (*Id.*)

Plaintiff was incarcerated on several occasions after her alleged onset date of December 15, 2003, but she could not remember the exact dates.  (R. at 45–46.)  She last used cocaine in May 2009.  (R. at 46–47.)  She abused drugs in the past to "make [her bipolar symptoms] go away" because "her medicines were not working right."  (R. at 47.)  Before her one-time relapse in May 2009, she last used drugs in October 2008; before that, she abstained from using drugs for eight months while she was incarcerated and "going through rehab."  (*Id.*)  It had been two and a half years since she was "using [drugs] more on a daily basis."  (*Id.*)  She had abused drugs because her life was "terrible."  (*Id.*)

Plaintiff worked as a hair stylist "for a while."  (*Id.*)  She used cocaine "in the back of the salon" to medicate herself and "stay awake."  (*Id.*)  She heard voices, experienced hallucinations, and became "so manic."  (*Id.*)  After her manic episodes subsided, she was "down for so many days."  (*Id.*)  She used cocaine "to get back up so [she] [could] go to work or [she] may end up getting fired."  (*Id.*)

Plaintiff dropped out of school after the eighth or ninth grade because she was "confused, [and] just couldn't keep up."  (R. at 49.)  She "started using crack cocaine seven or eight years ago."  (*Id.*)  Her auditory hallucinations began about two years earlier.  (*Id.*)  She struggled with bulimia for a long time.  (*Id.*)  Her mother had anorexia and "severe mental depression," and her father was an alcoholic. (R. at 50.)  She had one brother whom she had not contacted in 15 years.  (*Id.*)

Plaintiff began having problems with her "abdominal area" when she was 36 years old.  (*Id.*)  She "just started hurting real bad, [had] ulcers from nerves."  (*Id.*)  She "had five hernias removed from her navel" five years earlier.  (R. at 50–51.)  She also had "some fistulas" that "drain[ed] all the time" from her "navel."  (R. at 51.)  They sometimes hurt, and she went to Parkland to treat them

-28-

but they "kept[] draining." (*Id.*)

Plaintiff still vomited due to her bulimia, and her counselor called her every day to "make sure [she] [ate] right." (*Id.*) She used to vomit "every day, every meal." (*Id.*) She stopped vomiting every day since she began treating with her counselor. (R. at 51–52.) She "was always tired" due to her anemia. (R. at 52.)

Plaintiff's bipolar disorder was "still bad" after she last used cocaine in May 2009. (*Id.*) Her psychiatrist and LifeNet counselors were "trying to find [her] a medicine" to treat her bipolar symptoms. (R. at 53.) Sometimes she was "manic, manic, manic and then all of a sudden, for no reason … it just change[d] for no reason and it just [went] into depression." (*Id.*) When she was depressed, she became "suicidal" and went to the hospital to get help instead of using drugs. (*Id.*) During her manic episodes, she "clean[ed] things over and over." (*Id.*)

Plaintiff did not want to be a hair stylist anymore because she did not "want to touch anybody." (R. at 54.) She would be embarrassed; she imagined "be[ing] in the middle of a haircut and just hav[ing] to stop and leave" because "something might happen," her "mood [might] change." (*Id.*) She usually stayed at home when she was depressed. (*Id.*) She did not "feel the same as [other] people," she felt "lower than people," she felt as if "people [were] looking at [her]"; she could not explain it, she "just [did not] feel the same … not as good." (*Id.*)

Plaintiff had difficulty completing tasks. (*Id.*) She "start[ed] getting them done, [and] end[ed] up going to something else." (R. at 55.) Her counselor delivered her medications two or three times a week. (*Id.*) She could not keep her medications because of her suicidal ideations. (*Id.*)

Plaintiff received "behavioral therapy at LifeNet." (*Id.*) She could not live on her own because it was "too scary" and she did not like being alone. (*Id.*) She preferred being around other

people like her because they were "the only ones that underst[ood] her." (*Id.*) They could "talk [her] down, talk [her] out" of her episodes. (*Id.*) Except for her counselor, she believed that people who were not bipolar did not understand her "because they [could not] feel it." (*Id.*)

Plaintiff had "problems with [her] thinking." (R. at 55–56.) She had visual and auditory hallucinations "a couple of times a week." (R. at 56.) She first started taking medication consistently 14 months earlier, but "it wasn't working until just the past year." (R. at 57.) Before joining LifeNet, she could not take her medications independently because she was confused due to her anxiety and bipolar episodes. (*Id.*) While in prison, they gave her only one type of medication that did not relieve any of her symptoms. (R. at 58.)

Plaintiff asked the ALJ if she would be "in trouble" for taking pain medication that was prescribed to her for "a tooth ache." (R. at 75–76.) The ALJ explained that she "just need[ed] to have that documentation ... [from] the doctor," and the real concern was "about [Plaintiff] doing ... street drugs because that was really [her] thing before." (R. at 76.) The ALJ instructed counsel to submit "the records from [Plaintiff's] drug test[s] from whichever facilities or place[s] that [she] had them done so [that the ALJ] [could] add th[em] to the record." (R. at 74.)

### b.    *Counselor's Testimony*

Jennifer Carranza, Plaintiff's most recent counselor at LifeNet, also testified at the hearing. (R. at 59.) She worked at "LifeNet Behavioral Health Care" as a QMHP. (*Id.*) She had "a bachelor's degree in psychology" and was working on her master's degree in psychology and counseling. (R. at 60.) She was initially trained by LifeNet, and received "monthly updated training on how to deal with" her patients, and issues such as "medication compliance [and] deal[ing] with combative clients or clients who [did not] feel they were ill." (*Id.*)

Ms. Carranza began treating Plaintiff on May 4, 2009.  (*Id.* at 59.)  Plaintiff was referred to Ms. Carranza because she needed "more intensive level of service" and "was more of a suicidal watch," and the first thing Ms. Carranza did "was remove all her medications [from] her."  (*Id.* at 59-60.)  She saw Plaintiff two or three times a week, and helped her primarily in developing "adult daily living skills."  (*Id.* at 59.)  "A big part of" the program was "medication compliance and teaching [patients] a little bit about their mental illness and how to deal with it and how to cope out, so they [could] stay out in the community."  (*Id.*)

Ms. Carranza believed that Plaintiff was currently more "stable because she [could] understand the things she need[ed] to do when" Ms. Carranza visited her.  (R. at 61.)  She knew that "she ha[d] to take her med[ications]," knew when to take them, and knew how "to follow her daily activities."  (*Id.*)  She opined that Plaintiff had "extreme" manifestations of bipolar disorder; "her highs [were] extremely high [and] her lows [were] extremely low."  (*Id.*)  The "hardest part of [Plaintiff's] day [was] when it would be switching and she [was] having the problems of it going in between."  (*Id.*)  That was when Plaintiff felt "the most out of sorts ... [and] … feeling the most crazy."  (*Id.*)  Even in her more "stable situation," Plaintiff was still "having mood swings."  (*Id.*)  Ms. Carranza opined that Plaintiff's bipolar disorder was mainly depressive, and she could "get as low as being suicidal."  (*Id.*)  Plaintiff had suicidal ideations at least once a week.  (R. at 62.)  She repeatedly called Ms. Carranza on the phone "stating she [felt] really bad, scared, [and] afraid of harming herself if she [did] not have somebody there with her to talk to her or if she [could not] check herself into a hospital."  (R. at 61–62.)

Ms. Carranza believed that Plaintiff's constant struggle with depression made it difficult for her to leave the house.  (R. at 62.)  She was "scared to leave the house, afraid to be around people."

(*Id.*) She did not "have energy to go out and complete even daily living skills such as cooking and cleaning." (*Id.*) During her manic, "higher" episodes, she became "very scattered in her thinking." (*Id.*) She "jump[ed] completely" from one thought to another, and had to be "guide[d] ... back to what she was talking about before"— it took her "a lot of reminding." (*Id.*)

Ms. Carranza opined that Plaintiff still had "problems with [her] obsessive compulsive disorder," especially during her manic phases. (*Id.*) She cleaned her house and her fish "very well." (*Id.*) She focused on one particular task that was "on her mind at that moment and complete[d] [it] over and over and over and over until it [was] perfect in her mind." (R. at 62–63.) It therefore took her a long time to "get one thing done." (R. at 63.)

Ms. Carranza suspected that Plaintiff's psychological problems also "affected her physical problems." (*Id.*) Although she still had problems with bulimia, she was not being treated for it. (*Id.*) In May 2009, she "got [Plaintiff] entered into Turtle Creek Manor, which [was a] dual diagnosis program" to undergo treatment for her substance abuse. (R. at 63–64.)

Since Plaintiff started that program, Ms. Carranza "drug test[ed] her often and she ha[d] been clean." (R. at 63–64.) During May and June 2009, she tested her once a week, and by the time of the hearing she was testing her "at least once every two weeks." (R. at 64.) The drug test was "a complete panel," and tested for illegal and "legal substance[s] … anything she may be using, including her regular … medications." (*Id.*)

In response to counsel's question, Ms. Carranza testified that finding "the medicines that [would be] ideal [for] helping [Plaintiff]" was "still a work in progress." (*Id.*) By the time of the hearing, Plaintiff was "taking at least 11" different medications. (*Id.*) Dr. Rao, the "ACT team doctor," saw Plaintiff more frequently and gave her more "intensive" treatment than her previous

psychiatrist, in efforts to "work with her medications and get something right" for her.  (*Id.*)

Ms. Carranza did not believe that Plaintiff was at a point where she could be independent because she still had "problems with stability" and "medication compliance."  (*Id.*)  If Plaintiff thought a medication was not helping her, "she ha[d] a tendency to stop taking it."  (R. at 65.)  She was also "very impulsive" and had "problems with managing money."  (*Id.*)  She lacked "stable resources," such as "outside help and [family] support."  (*Id.*)

Ms. Carranza testified that Plaintiff experienced side-effects every time her medications were changed.  (*Id.*)  "Higher doses ma[de] her nauseous or wanting to vomit."  (*Id.*)  She believed that Plaintiff had struggled with her bipolar disorder her entire life based on her reports of her symptoms and her past tendency to "self-medicate" with illegal drugs.  (R. at 66.)  Plaintiff saw her psychiatrist once a month and visited with Ms. Carranza at least three times a week.  (*Id.*)

### c.      *Vocational Expert Testimony*

A vocational expert (VE) also testified at the hearing.  (R. at 70.)  The VE testified that Plaintiff's past relevant work was her job as a hair stylist (light, skilled, SVP-6).  (*Id.*)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform her past relevant work with the following limitations:  lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six of eight hours; never work in proximity to hazards, including unprotected heights, moving machinery, open flames, and dangerous chemicals; never drive as an essential job duty; occasional contact with supervisors and co-workers; incidental contact with the public; and reasoning, math, and language levels of 2, 1, 1, respectively.  (*Id.*)  The VE testified that the hypothetical person could not perform Plaintiff's past relevant work but could perform other jobs such as cleaner/housekeeper (light, unskilled, SVP-2),

with 12,400 jobs in Texas and 147,600 in the national economy; marker (light, unskilled, SVP-2), with 2,900 jobs in Texas and 37,200 in the national economy; and power screw driver operator (light, unskilled, SVP-2), with 1,500 jobs in Texas and 28,800 in the national economy.  (R. at 71.)

After the ALJ modified the hypothetical to include only incidental contact with co-workers, the VE testified that the hypothetical person could still perform those jobs.  (*Id.*)  The VE testified that if the hypothetical person missed 18 days or more of work, she "would not be able to maintain employment."  (*Id.*)  The tolerance for going "off-task" was 10 minutes per hour. (R. at 71–72.)

Counsel then modified the hypothetical to limit understanding, remembering, and carrying-out detailed instructions to only 80 to 90 percent of the time, and to include a 25 to 30 percent reduction in the following abilities: understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in work settings.  (R. at 72–73.) The VE testified that the hypothetical person could not perform Plaintiff's past relevant work or any other job in the national economy because those mental limitations exceeded the 10 minutes per hour tolerance for going off task.  (R. at 73.)

Counsel modified the hypothetical to reduce the ability to perform the following tasks to 67 to 80 percent of the time: get along with co-workers, set realistic goals, make plans independently of others, and complete a normal workday or workweek without interruptions from psychologically-based symptoms.  (R. at 73–74.)  The VE testified that the hypothetical person could not maintain

competitive employment with those limitations.  (R. at 74.)

In response to a question by the ALJ, the VE testified that his testimony did not conflict with the Dictionary of Occupational Titles (DOT), except that the DOT did not address driving or having contact with different groups—that part of his testimony came from experience.  (*Id.*)

## C.   ALJ's Findings

The ALJ issued her decision denying benefits on May 13, 2010.  (R. at 16–31.)  At step one, she found that Plaintiff met the insured status requirements through September 30, 2006, and had not engaged in substantial gainful activity since her alleged onset date of December 15, 2003.  (R. at 18–19.)  At step two, she found that Plaintiff's substance abuse and bipolar disorders were a "severe combination of impairments."  (R. at 19.)  She found that absent her substance abuse, her "remaining limitations would cause more than a minimal impact" on her ability to work, and she would therefore "continue to have a severe impairment or combination of impairments."  (R. at 23.)  At step three, she found that Plaintiff's impairments satisfied the criteria of listings 12.04 for bipolar disorder and 12.09 for substance addiction disorder.  (R. at 19.)  Absent Plaintiff's substance abuse, however, the ALJ determined that her bipolar disorder, while still a severe impairment, neither met nor equaled listing 12.04, and was therefore not *per se* disabling under the regulations.  (R. at 23.)

Next, the ALJ determined that if Plaintiff "stopped the substance abuse," she would have the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with the following limitations: lift no more than 20 pounds occasionally; lift and carry up to 10 pounds frequently; stand, walk, and sit approximately 6 hours of an 8-hour workday; push and pull with upper and lower extremities; occasional arm-hand use for grasping, holding, and turning objects; never work in proximity to hazards, such as heights, moving machinery, open flames, or dangerous

chemicals; never drive "as an essential job duty"; occasional contact with co-workers and supervisors; incidental contact with the public; and reasoning, mathematics, and language skills to understand and carry-out detailed but uninvolved written or oral instructions, deal with problems involving a few concrete variables, perform basic arithmetic operations, and read, write, and speak in simple sentences using normal word order.[6]  (R. at 24–25.)

At step four, based on the VE's testimony, the ALJ found that absent her substance abuse, and based on her age, education, work experience, and RFC, Plaintiff could not perform her past relevant work as a hair stylist.  (R. at 30.)  At step five, with the VE's testimony, the ALJ determined that Plaintiff could perform "light, entry-level" jobs existing in significant numbers in the national economy, including cleaner/housekeeper/house-cleaner, with 12,400 jobs in Texas and 147,600 jobs in the national economy; marker, with 2,900 jobs in Texas and 37,200 jobs in the national economy; and power screw driver operator, with 1,500 jobs in Texas and 28,800 jobs in the national economy. (R. at 30–31.)  Accordingly, the ALJ determined that absent her drug abuse, Plaintiff was not disabled at any time between her alleged onset date and the date of the ALJ's decision.  (R. at 31.)

## II. ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

---

[6]  The ALJ explained that these mental limitations equaled "reasoning, math, and language" levels of "2-1-1" respectively, as defined in the DOT.  (R. at 25.)

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id*.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work,
    other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813

F.2d 55, 58 (5th Cir. 1987).

### 3.       Standard for Finding of Entitlement to Benefits

As an alternative to remand, Plaintiff asks the Court to reverse the Commissioner's decision "and award the benefits she is due without the unnecessary delay that would be caused by further administrative proceedings."  (Pl. Br. at 26.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits."  *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009).  The claimant must carry "the very high burden of establishing 'disability without any doubt.'"  *Id.* at *11 (citation omitted).  Inconsistencies and unresolved issues in the record preclude an immediate award of benefits.  *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).  The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B.       <u>Issues for Review</u>

Plaintiff presents the following issues for review:

(1)      If a claimant is found disabled but drug or alcohol use is found material to that disability, the claimant cannot receive benefits under the Social Security Act.  The claimant bears the burden of proving that his limitations are disabling despite alcohol use, but the ALJ is required to support a finding of materiality with substantial evidence.  Is the ALJ's materiality finding supported when uncontroverted evidence from McNeal's treating psychiatrists and mental health provider indicate that substance use is not material?

(2)      The Fifth Circuit directs that the opinions of a claimant's treating specialist should ordinarily be given great or controlling weight.  Further, opinions from "other sources" must also be considered.  The ALJ rejected the opinions of McNeal's treating psychiatrist and mental health provider.  Did the ALJ create reversible error in his rejection or diminution of these opinions?

(3)     When the ALJ finds that the claimant has medically determinable severe impairments, the combined impact of the impairments must be considered throughout the disability determination process.  McNeal's OCD and personality disorder were not found to be medically determinable or severe by the ALJ, and they were not considered in combination with her other impairments when making the disability determination.  Did the ALJ's failure to consider McNeal's OCD and personality disorder in combination with her other impairments prejudice her case?

(Pl. Br. at 1–2.)

## C.     Treating Physician Rule[7]

Plaintiff argues that remand is required because the ALJ improperly rejected the opinions of Dr. Rao, her treating psychiatrist, and Ms. Carranza, her counselor.  (Pl. Br. at 12, 18–22.)

### 1.     *Ms. Carranza's Opinions*[8]

Plaintiff argues that the ALJ improperly discounted, without providing an explanation or performing a factor-by-factor analysis, Ms. Carranza's testimony and written opinions that despite her abstinence from illegal drugs and alcohol, her bipolar disorder continued to cause her disabling limitations.  (Pl. Br. at 18–22.)  She contends that the ALJ's error prejudiced her claim because "Ms. Carranza's opinions directly contradicted the ALJ's findings regarding both the materiality of [Plaintiff's] drug use and her RFC, were [her] drug use to cease."  (*Id.* at 22.)

As a counselor, or QMHP, Ms. Carranza was not an "acceptable medical source." *See* 20 C.F.R. § 404.1513(d) (2011) (providing a non-exhaustive list of non-medical sources, which includes "therapists" and "counselors"); Social Security Ruling (SSR) 06–03R, 2006 WL 2329939, at *2 (S.S.A. 2006) ("non-medical sources" include "public and private social welfare agency

---

[7]  Plaintiff's second issue is addressed first because its resolution impacts the resolution of her first issue.

[8]  Ms. Carranza's testimony and written opinions are addressed first, separately from Dr. Rao's opinions, because they require a different legal analysis.

personnel [and] rehabilitation counselors"). Ms. Carranza's opinions were therefore not "medical opinions," and could not be used to establish the existence of a medically determinable impairment. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources...."); 20 C.F.R. § 416.913(a) (only "evidence from acceptable medical sources" is used to determine whether the claimant has "a medically determinable impairment").

Ms. Carranza submitted an undated letter stating that Plaintiff was referred to LifeNet because she could not perform her activities of daily living without intensive assistance, had abstained from using illegal drugs and alcohol "while assigned to the ACT Team" program, and continued to have a "low functioning ability" despite her abstinence. (R. at 1434.) In finding that absent Plaintiff's substance abuse, her bipolar disorder did not preclude her from engaging in substantial gainful activity, the ALJ determined that Ms. Carranza's letter could "not be afforded any weight or merit" because it was undated and the ALJ had "no way to tell what time period [it] referenced." (R. at 26.)

Ms. Carranza testified that she and Plaintiff's probation officer regularly drug-tested Plaintiff since she started the dual diagnosis rehabilitation program at Turtle Creek Manor. (R. at 63–64.) She opined that although Plaintiff was "somewhat stable psychologically," she was not stable enough to function independently because she had "issues with medication compliance, impulsivity, money management, and lack of stable social resources." (*See* R. at 63–65.) While the ALJ did not do so explicitly, her rejection of Ms. Carranza's testimony is shown in part by her conclusion that Plaintiff "and her attorney [had] failed to carry their burden to demonstrate" that she had "disabling

psychiatric symptoms when regularly [taking] prescribed medications and not engaging in drug and/or alcohol abuse." (R. at 29.)

Although the ALJ was required to consider Ms. Carranza's opinions, along with all the other evidence in the record, she was not required to give them any weight or analyze them under 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See Berry v. Astrue*, No. 3:11-CV-02817-L BH, 2013 WL 524331, at *19 (N.D. Tex. Jan. 25, 2013), *recommendation adopted*, 2013 WL 540587 (N.D. Tex. Feb. 13, 2013); SSR 06–03R, 2006 WL 2329939, at *4. Accordingly, the ALJ did not err in rejecting Ms. Carranza's testimony and written opinions. *See Berry*, 2013 WL 524331, at *19–20; *see also Hayes v. Astrue*, No. 3:11-CV-1998-L, 2012 WL 4442411, at *3 (N.D. Tex. Sept. 26, 2012) (finding no error where the ALJ rejected the opinions of a treating registered nurse; explaining that "the ALJ was not required to give her opinions any weight" because she was "not an 'acceptable medical source'").

### 2.      *Dr. Rao's Opinions*

Plaintiff also argues that the ALJ improperly rejected, without finding good cause or conducting a factor-by-factor analysis under 20 C.F.R. §§ 404.1527(c) and 416.927(c), Dr. Rao's treating opinions, including his written statements regarding her abstinence from illegal drugs and alcohol, as well as his mental RFC findings that she had notable limitations in 14 mental work-related abilities. (Pl. Br. at 18–20.

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(1) (2012). A treating source is a

claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton*, 209 F.3d at 455. If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's

views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis in *Newton*). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Rao's March 2009 mental RFC questionnaire and his undated letter were "treating source" statements subject to the six-factor analysis under 20 C.F.R. § 404.1527(c). *See* 20 C.F.R. § 404.1502. In finding that Plaintiff retained the RFC to perform light work with certain mental limitations absent her drug abuse, the ALJ stated that she "considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927." (R. at 24–25.)

Dr. Rao's letter stated his opinion that Plaintiff's history of chemical dependency had exacerbated her mental health issues in the past, but it noted that she had willingly undergone a drug rehabilitation program and was abstaining from using illegal drugs and alcohol while participating in LifeNet's ACT Team program. (R. at 1435.) Despite her abstinence, Plaintiff still needed the structure and assistance provided by the program to maintain her current level of stability and cognitive functioning. (*Id.*) Although the record showed that Plaintiff joined the ACT Team program in September 2008, and was still involved in it as of the date of the hearing, the ALJ gave Dr. Rao's letter "little to no weight" because it was undated and could not be applied "to any particular time period." (*See* R. at 26, 29, 43, 518.) The ALJ did not find as a factual matter, and based on competing first-hand evidence, that another psychiatrist's opinion was better-founded than Dr. Rao's statements. Neither did the ALJ weigh his opinion on Plaintiff's continued mental

-44-

limitations despite her abstinence against the opinion of other psychiatrists who had treated or examined her, and had specific medical or psychiatric bases for a contrary opinion. *See Newton*, 209 F.3d at 458.

Although an ALJ may reject a treating physician's opinion when the physician lacks credibility, the ALJ must find "with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'" *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). Here, the ALJ did not make such a finding. Dr. Rao's statement that Plaintiff was abstaining from using illegal drugs and alcohol while participating in the ACT Team program was supported by her eight  negative drug tests dating from early February to late September 2009.  (*See* R. at 775, 1437–39, 1441–42, 2011, 2217–22.)  Ms. Carranza's testimony and undated letter also confirmed Plaintiff's alleged abstinence from alcohol and illegal substances during that time.  (R. at 63–64, 1434.)  In September 2008, Dr. Muirhead diagnosed Plaintiff with mixed substance abuse in remission.  (R. at 485.)  In October 2008, Dr. Miller, a non-examining SAMC, diagnosed her with mixed substance abuse in early remission.  (R. at 495.)  Because Dr. Rao's statements regarding Plaintiff's mental limitations despite her abstinence were not conclusory, were not controverted by first-hand psychiatric evidence, and were supported by the record,  the ALJ was required to perform the six-factor analysis of 20 C.F.R. § 404.1527(c) (1)-(6).  Instead of doing so, she summarily dismissed them because they were undated.  *See Newton*, 209 F.3d at 453–55.

While the ALJ acknowledged and expressly rejected Dr. Rao's undated letter, she did not discuss or even mention his mental RFC questionnaire.  (*See* R. at 16–31.)  In his March 9, 2009 mental RFC questionnaire, Dr. Rao opined that Plaintiff either was "unable to meet competitive standards," had "no useful ability to function," or was "severely limited" in 14 mental work-related

abilities.  (R. at 578–79.)  These abilities included her ability to cope with normal work stress, get along with co-workers without unduly distracting them or exhibiting behavioral extremes, maintain concentration for two hours, understand, remember, and carry out detailed instructions, make simple decisions, and accept instructions and respond appropriately to criticism.  (*See id.*)  Dr. Rao also opined that she had difficulty working on a sustained basis due to her anxiety, poor personal relations, lack of insight, and mood swings.  (R. at 580.)  As with his letter, the ALJ did not weigh Dr. Rao's mental RFC questionnaire against another psychiatrist's opinions, find that one opinion was better founded than the other, or attempt to find good cause for rejecting Dr. Rao's questionnaire altogether.  The ALJ was therefore required to conduct a factor-by-factor analysis before rejecting Dr. Rao's questionnaire.  She did not perform such an analysis, however, given that she never mentioned or addressed Dr. Rao's questionnaire in her summary of the evidence.  (*See* R. at 16–31.)

By failing to properly evaluate Dr. Rao's treating opinions under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the ALJ committed legal error.  *See Harris v. Astrue*, No. 3:11-CV-1089-M-BH, 2012 WL 4442303, at *13 (N.D. Tex. Sept. 7, 2012), *recommendation adopted*, 2012 WL 4458405 (N.D. Tex. Sept. 26, 2012) (finding legal error where the ALJ implicitly rejected, by failing to even acknowledge, a treating physician's opinions, and failed to find good cause or conduct a factor-by-factor analysis under 20 C.F.R. §§ 404.1527(c) and 416.927(c)); *see also Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (violation of a regulation constitutes legal error).

Although the ALJ erred by improperly evaluating Dr. Rao's opinions, the Court must still consider whether the error was harmless.  *See Harris*, 2012 WL 4442303, at *14–15 (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R.

§§ 404.1527(c)).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

The Commissioner essentially contends that the ALJ's rejection of Dr. Rao's opinions does not warrant reversal because the "medical evidence of record overwhelmingly indicate[d] that Plaintiff was abusing drugs throughout the relevant time period."  (D. Br. at 7–14.)  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Newton*, 209 F.3d at 455 (citation omitted).  It is well established that a court may only affirm the ALJ's decision "on the grounds which [she] stated for doing so."  *Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) (per curiam); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2001) (An "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").

Here, the ALJ found at step three that absent her substance abuse, Plaintiff's bipolar disorder did not meet listing 12.04(A)(1)-(B) by making her own estimation of what Plaintiff's paragraph B limitations would be if she ceased abusing drugs.  (R. at 23–24.)  If the ALJ had considered and accepted Dr. Rao's statement that Plaintiff was abstaining from using illegal drugs and alcohol while she was enrolled in the ACT Team program, the ALJ might have concluded that Plaintiff had met her burden to show that her drug abuse was not a material factor contributing to her disability.  Accordingly, the ALJ would have determined that Plaintiff's bipolar disorder met the severity criteria of listing 12.04(A)(1)-(B) regardless of any drug abuse.

Alternatively, if the ALJ had considered and accepted Dr. Rao's mental RFC questionnaire, the ALJ might have imposed greater restrictions on Plaintiff's mental RFC.  Had the ALJ tracked

this more restricted RFC in her hypothetical to the VE, a different conclusion might have been reached regarding Plaintiff's ability to perform the jobs of cleaner/housekeeper/house-cleaner, marker, and power screw driver operator. Because it is not inconceivable that the ALJ would have reached a different disability determination had she properly considered Dr. Rao's opinions, her error was not harmless and requires remand.

**D.    Substance Abuse**

Plaintiff argues that the ALJ erred in finding that her drug abuse was a material factor contributing to her disability because her medical evidence, including her treating sources' opinions, demonstrated that her bipolar disorder was severe enough to meet listing 12.04 and preclude her ability to "function independently outside of a structured treatment program." (Pl. Br. at 14–18.)

An individual is not disabled if alcoholism or drug addiction is a contributing factor material to the determination of disability. *Gill v. Astrue*, No. CIV.A.7-09-CV-155-O, 2010 WL 930999, at *9 (N.D. Tex. Mar. 15, 2010) (citing 42 U.S.C.A. § 1382c(a)(3)(J) (West 2004)). In determining whether the claimant's drug or alcohol addiction is a contributing factor material to the determination of disability, the Commissioner considers whether the claimant would still be disabled if she discontinued using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1) (2012). If the claimant's remaining limitations after discontinuing substance abuse would not be disabling, drug or alcohol addiction is a contributing factor material to the determination of disability and the claimant is found not to be disabled. *Id.* § 404.1535(b)(2)(I). The claimant bears the burden of proving that her drug or alcohol addiction is not a material factor contributing to her disability. *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *Gill*, 2010 WL 930999, at *9.

At step three of the sequential evaluation process, the ALJ determined that Plaintiff's bipolar

disorder met the severity criteria of listing 12.04(A)(1)-(B)[9] for affective disorders and was therefore disabling, but only when considered in combination with her "active substance abuse."   (R. at 19–23.)   The ALJ first found that it met the paragraph A criteria because Plaintiff's "mental impairments [were] characterized in part by appetite and sleep problems, decreased energy, difficulties with thinking and concentration, and suicidal thoughts."  (R. at 21.)  She also found that it satisfied the paragraph B criteria because Plaintiff's mental impairments caused her "marked difficulties" in social functioning and in maintaining concentration, persistence, and pace, and she had "experienced one to two episodes of decompensation" of extended duration.  (R. at 21–22.)

The ALJ next determined that if Plaintiff "stopped [her] substance abuse," her bipolar disorder would still be a severe impairment but would not be severe enough to meet the criteria of listing 12.04(A)(1)-(B).  (R. at 23–24.)  The ALJ found that the paragraph B criteria would not be satisfied absent substance abuse because Plaintiff had only a "mild restriction" in her activities of daily living, "moderate difficulties" in social functioning and in her "ability to concentrate and

---

[9]  If a claimant suffers from a severe mental impairment or combination of impairments, at step three, the ALJ must evaluate its severity in order to determine whether it meets or medically equals an impairment listed in the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(iii) (2012).  Listing 12.04(A)(1)-(B) requires:

(A)(1).  Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feeling of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h. Thoughts of suicide; or
    i. Hallucinations, delusions or paranoid thinking;        ....
    [AND]
(B)  ... at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration,  persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.
20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(A) and (B) (2012).

maintain persistence and pace," and experienced no episodes of decompensation, given that "most of her hospitalizations were resultant of her narcotic and substance abuse." (*See id.*)  Because Plaintiff "wholly failed to provide credible evidence to demonstrate her functioning absent the effects of substance abuse," the ALJ explained, her findings of Plaintiff's "levels of functioning" in the paragraph B criteria were only a "generous … estimation based on [Plaintiff's] documented brief episodes of apparent sobriety while not incarcerated."  (R. at 24.)

Before proceeding to steps four and five, the ALJ determined that absent her substance abuse, Plaintiff retained the RFC to perform light work with several mental limitations, including occasional contact with co-workers and supervisors, incidental contact with the public, understand and carry out detailed but uninvolved written or oral instructions, deal with problems involving a few concrete variables, and read, write, and speak in simple sentences using normal word order. (*See* R. at 24–25.)  Because the VE opined that Plaintiff could not perform her past relevant work given her RFC, at step five, based on the VE's testimony, the ALJ determined that Plaintiff could perform other work if she stopped her substance abuse, and was therefore not disabled.  (R. at 30–31.)

In making her materiality determination, the ALJ concluded that Plaintiff had "failed to meet her burden to separate the effects of her continued substance abuse after [her] alleged onset date from the symptoms and functional limit[ation]s that would otherwise be imposed by her medically determinable impairments."  (R. at 26.) She stated that Plaintiff submitted drug tests that "were [not] included in the LifeNet records" and were not those "referred to at the hearing and associated with [the] management and treatment of her substance addiction," but were instead administered during her unrelated visits to the emergency room.  (*Id.*)  The ALJ did not address the six drug tests

administered by Quest Diagnostics between February 12, 2009 and September 24, 2009 upon the direction of Dr. Rao, from "LifeNet Community Healthcare." (*See* R. at 1437–42.) Her results were negative on five of those tests.[10]   Plaintiff took at least three other toxicology tests in February and March 2009, at Green Oaks, Presbyterian, and MRMC, that were also negative. (*See* R. at 775, 2011, 2217–22.)   As evidence that Plaintiff continued to "abuse" drugs in 2009, the ALJ identified two dates on which she presented to Presbyterian complaining of dental pain, for which she requested, and was prescribed, Vicodin. (R. at 28, 2223, 2207.)[11]

As noted, the ALJ did not mention Dr. Rao's opinion in his March 9, 2009 mental RFC questionnaire that Plaintiff was "unable to meet competitive standards," had "no useful ability to function," or was "severely limited" in 14 mental work-related abilities. (*See* R. at 16–31, 576–80.) Most of these limitations indicated that she was markedly restricted in social functioning and maintaining concentration, persistence, and pace. (*See* R. at 576–80.)   Similarly, the ALJ did not address his opinion that Plaintiff would have difficulty working on a sustained basis due to her anxiety, poor personal relations, mood swings, and lack of insight. (R. at 580.)   The ALJ acknowledged but expressly rejected Dr. Rao's undated letter in which he stated that Plaintiff had

---

[10] Plaintiff tested positive for opiates and hydrocodone in a drug test conducted by Quest Diagnostics on February 20, 2009. (R. at 1442.)   The day before, while she was being treated at Green Oaks, the attending nurse noted that she would administer to Plaintiff "Norco" as needed for her pain, and as "ordered" by the treating physician. (*See* R. at 775.)   Plaintiff also tested positive for cocaine in a drug test taken on May 1, 2009, and she admitted this at the hearing. (*See id.* at 46, 1440.)

[11] The Commissioner identifies additional dates when physicians prescribed Plaintiff narcotic pain medicine. (*See* D. Br. at 7, 12.)   On December 5, 2008, Plaintiff presented to Baylor and was issued a one-time prescription of "2 tablets"of Norco for a headache. (R. at 672.)   On December 7, 2008, also at Baylor, she was given a one-time dose of "1 Dilaudid"— a narcotic pain medication, several other one-time doses of medication for hypertension, schizophrenia, and allergies, and was issued prescriptions for hypertension and migraine medications. (*See* R. at 647–58.)   On March 6, 2009, Dr. McCarthy, from MRMC, prescribed Plaintiff "1 tablet" of Norco, which was "[g]iven by mouth" to her by the attending nurse. (*See* R. at 2008.)   On September 14, 2009, she was prescribed 15 tablets of Vicodin but tested "negative" for opiates ten days later. (*See* R. at 1437, 2202.)   In light of her negative toxicology tests, the conservative quantities prescribed, and the fact that Plaintiff had legitimate reasons and valid prescriptions to take these medications, it is not clear that she was "abusing" them.

"abstained from using any illegal drugs or alcohol" while she was assigned to LifeNet's "ACT Team program,"[10] and he opined that despite her abstinence, she still needed the structure and assistance provided by the program.  (R. at 26, 29, 1435.)  The ALJ concluded that Plaintiff "and her attorney [had] failed to carry their burden to demonstrate" that she had "disabling psychiatric symptoms when regularly [taking] prescribed medications and not engaging in drug and/or alcohol abuse."  (R. at 29.)  Because Plaintiff failed to meet this burden, the ALJ determined that if she "stopped the substance abuse," she would have the mental RFC to engage in substantial gainful activity and was therefore not disabled.  (R. at 30.)

The ALJ's statement that Plaintiff did not submit her LifeNet drug tests, coupled with her improper evaluation of Dr. Rao's opinions, fairly detracts from her determination that Plaintiff's substance abuse was a material factor contributing to her disability.  Plaintiff's negative drug tests from LifeNet supported Dr. Rao's statement that she was abstaining from illegal drugs and alcohol while participating in the ACT Team program.  Moreover, apart from Dr. Rao, Dr. Miller, a non-examining SAMC, was the only other physician who opined on whether, and to what extent, Plaintiff's substance abuse affected her mental limitations.  (*See* R. at 487–504.)  Despite Dr. Rao's and Dr. Miller's opinions, the ALJ made her own "estimation" of Plaintiff's paragraph B limitations during her "brief episodes of apparent sobriety."  (*See* R. at 23–24, 497, 576–80, 1435.)

By finding that Plaintiff could understand and carry out detailed but uninvolved instructions, the ALJ essentially rejected Dr. Rao's opinion that Plaintiff was "seriously limited" in her ability to understand, remember, and carry out detailed instructions.   (*See* R. at 24, 579.)  The ALJ also implicitly rejected Dr. Miller's consultative mental RFC finding that Plaintiff was "markedly

---

[10]  Plaintiff enrolled in LifeNet's ACT Team program in September 2008.  (*See* R. at 545.)

limited" in her ability to understand, remember, and carry out detailed instructions, and could understand, remember, and carry out "only simple instructions," even when she was "fairly well compensated [by] not abusing substances." (*See* R. at 24, 503.)  Accordingly, the ALJ's materiality determination cannot be said to be supported by substantial evidence.  *See Gill*, 2010 WL 930999, at *10 (finding that substantial evidence did not support the ALJ's materiality determination because it was not based on "concrete medical evidence"); *see also Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009) ("[A]n ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions.") (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

Because "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show that she was prejudiced by the ALJ's finding that she did not submit the required drug tests, as well as by her failure to properly consider Dr. Rao's opinions in making her materiality determination. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision."  *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  To establish prejudice, Plaintiff must show that the ALJ's proper evaluation of Dr. Rao's opinions, in light of Plaintiff's negative drug tests from LifeNet, might have led to a different decision of disability.  *See Bornette*, 466 F. Supp. 2d at 816; *see also Newton*, 209 F.3d at 458.

Here, if the ALJ had considered Plaintiff's LifeNet drug tests, and accepted Dr. Rao's statement that she was abstaining from using illegal drugs and alcohol while participating in the

ACT Team program, the ALJ might have concluded that Plaintiff had met her burden to show that her drug abuse was not a material factor contributing to her disability.   The ALJ would have therefore determined that Plaintiff's bipolar disorder met the severity criteria of listing 12.04(A)(1)-(B).   Alternatively, if the ALJ had considered and accepted Dr. Rao's mental RFC questionnaire, which he conducted at a time when Plaintiff's drug tests were consistently negative, the ALJ might have imposed greater restrictions on her mental RFC.   Had the ALJ tracked this RFC in her hypothetical to the VE, a different conclusion might have been reached regarding Plaintiff's ability to perform the jobs of cleaner/housekeeper/house-cleaner, marker, and power screw driver operator. Accordingly, the ALJ's materiality determination cannot be said to be supported by substantial evidence, and remand is required because the ALJ's failure to properly consider Plaintiff's medical evidence prejudiced her claim.

Because the ALJ's proper consideration of Plaintiff's medical evidence on remand will necessarily impact the determination of her mental RFC and her ability to work absent her substance abuse, the Court does not reach her third issue.[11]

## III.   CONCLUSION

Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 28th day of March, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[11]  Plaintiff has not met her "heavy burden" to prove disability because there are unresolved issues in the record to be determined upon remand.  Her request for disability benefits at this stage of the proceedings is denied.